IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

REO L. COVINGTON,

Plaintiff,

v.

OPINION and ORDER

23-cv-166-wmc

NANCY BOWENS, PATRICK MURPHY and MELANIE BERNIER,

Defendants.

---

Plaintiff Reo Covington, who is representing himself, claims that he was denied insulin while incarcerated at Oshkosh Correctional Institution, in violation of the Eighth Amendment. Plaintiff named as defendants a doctor, Patrick Murphy, and advanced practice nurse prescriber, Nancy Bowens, both of whom are represented by the state, as well as a registered nurse, Melanie Bernier, who is not represented and has not filed an answer or otherwise appeared. Plaintiff has moved for default judgment against Bernier (dkt. #56), and partial summary judgment against defendants Murphy and Bowens (dkt. #46), who not only opposed plaintiff's motion but cross-moved for summary judgment (dkt. #58).

Because there are material factual disputes regarding defendants' treatment of plaintiff, the court must deny both sides' cross-motions for summary judgment. The court will also reserve entry of a default judgment against defendant Bernier until resolving the other claims on the merits. *See Home Ins. Co. of Illinois v. Adco Oil Co.*, 154 F.3d 739, 741 (7th Cir. 1998) (A court may not enter default judgment in a suit against multiple defendants "until the matter has been resolved as to all."). Thus, the court will deny the motion for default judgment without prejudice but will reopen the motion after the other claims are resolved. Further, the court will deny without prejudice plaintiff's miscellaneous motions relating to discovery or

summary judgment, as moot. (Dkt. ##52, 53, 55, 65, 77, 78). Finally, the court will attempt to recruit counsel for plaintiff to represent him at trial.

## UNDISPUTED FACTS[1]

Plaintiff Reo Covington was incarcerated at Oshkosh Correctional Institution at all times relevant to this lawsuit. In 2008, he was diagnosed with Type 2 diabetes. Type 2 diabetes is a chronic condition where the body either does not produce enough insulin or does not use insulin effectively, leading to high blood sugar (glucose) levels, called hyperglycemia. For a person with diabetes, hyperglycemia is usually considered to be a blood glucose level above 130 mg/dl before meals and above 180 mg/dL one to two hours after eating, though both thresholds can vary depending on the person.[2] Hyperglycemia can also be determined based on an A1C test, which shows a person's average blood sugar level for the past two or three months. On average, an A1C level higher than 7% means that the person's blood sugar level, was above a healthy range for at least part of this period.[3] Early symptoms of hyperglycemia include fatigue, increased thirst and hunger, frequent urination, headaches and blurred vision.

[1] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact, responses and replies, as well as the underlying record, where appropriate. While plaintiff purported to object to many of defendants' proposed findings of fact, most of his disputes were not genuine, as defendants' proposed findings were based on the personal knowledge of declarants or other documents, including plaintiff's own medical records. On the other hand, defendants likewise objected to many of plaintiff's proposed findings of fact as being contrary to documentation in his medical records, ignoring that many of plaintiff's proposed facts were based on *his* personal experience or version of events. Thus, the court adopts as undisputed all material facts that the parties supported with uncontradicted, admissible evidence, while noting genuine factual disputes.

[2] Accessed at https://my.clevelandclinic.org/health/diseases/9815-hyperglycemia-high-blood-sugar (last visited September 8, 2026).

[3] Accessed at https://www.mayoclinic.org/diseases-conditions/hyperglycemia/diagnosis-treatment/drc-20373635 (last visited September 8, 2026).

Symptoms of long-term hyperglycemia include fatigue, weight loss, skin infections, slow-healing cuts or sores, and even cell damage leading to cardiovascular and other chronic diseases.[4] Untreated, acute hyperglycemia can also lead to diabetes-related ketoacidosis, which causes chest pain, shortness of breath, abdominal pain, nausea or vomiting, confusion, rapid breathing, rapid heart rate, or low blood pressure. Left untreated, ketoacidosis can even trigger a diabetic coma, brain damage or death.

Hyperglycemia is treated in a variety of ways, including diet and exercise changes, oral medications that alter the production of glucose and insulin, and insulin injections. In January 2017, Covington met to discuss medication management for his Type 2 diabetes with defendant Nancy Bowens, an advanced practice nurse prescriber ("APNP") and his assigned primary care provider, and Dr. Herb Roehrich, a psychiatrist and Covington's mental health provider.[5] After the appointment, Covington's diabetes treatment plan included daily metformin (an oral medication that lowers blood sugar levels), and 10 units of intermediate-acting insulin to be taken at bedtime. APNP Bowens also asked Covington to keep a diabetic log of his blood glucose levels and the amounts of insulin he was taking so the health services unit ("HSU") could monitor him. Covington kept those logs for January, March, and April, but was less consistent after that.

On April 20, 2017, Covington saw APNP Bowens again in the HSU for a blood sugar check and insulin administration. Bowens noted that Covington was skipping approximately

---

[4] Accessed at https://www.cdc.gov/diabetes/diabetes-complications/diabetes-and-your-heart.html (last visited July 20, 2026); https://my.clevelandclinic.org/health/diseases/9815-hyperglycemia-high-blood-sugar (last visited July 20, 2026).

[5] Dr. Roehrich was apparently involved both because Covington felt safer with him and because some psychotropic medications he prescribed to Covington can increase insulin resistance.

50% of the blood sugar checks and insulin administration without having subsequent spikes in his blood sugar levels. Based on his lack of hyperglycemic symptoms despite missing some insulin doses, Bowens decided that Covington's diabetes was well controlled and he no longer needed metformin or the intermediate-acting insulin. She then cancelled both prescriptions.

According to Covington, Bowens never told him that his medications were being cancelled, so he was surprised that his request for a refill of metformin was denied in May 2017. Covington then reached out to his psychiatrist, Dr. Roehrich, who reordered the metformin for him. On May 30, 2017, Covington saw Bowens for another follow up on his diabetes. He told Bowens that he had been working on his diet and exercise and his blood sugar levels had been in the 100s. As a result, Bowens did not change Covington's then treatment plan, although according to Bowen, she did not know that Covington was still taking metformin at this time.

Sometime during the summer and fall of 2017, Covington reports losing trust in APNP Bowens and no longer wanting to see her for treatment.[6] As a result, he refused his A1C checks in October and November 2017. However, according to Covington, he had nevertheless been told by HSU staff to report any blood sugar readings over 250 and to receive insulin when needed. On December 13, 2017, Covington went to HSU in the morning to report that his blood sugar was 400 and he needed insulin, but was told that no insulin was available for him in his diabetes "kit" and he should come back later. Covington returned to HSU that same afternoon and reported to defendant Nurse Bernier in HSU that his blood sugar was still 375

[6] According to Covington, both APNP Bowens and Nurse Bernier repeatedly pressured him to drop a lawsuit he had filed against another medical provider at the prison related to an alleged sexual assault, although Bowens denies ever raising this other lawsuit with Covington.

and had been 400 that morning. At that time, he denied any chest pain or shortness of breath and had clear speech and heart sounds, but he also stated that he'd had frequent urination, unquenchable thirst, blurred vision, was "feeling weird" overall, and needed insulin. Covington also requested that Dr. Roehrich be contacted. Instead, Nurse Bernier reported Covington's symptoms and blood sugar numbers to Dr. Murphy, who was not Covington's primary care provider but was the physician on call at the time. Berner also told Covington that he needed to cooperate with Bowens to get insulin. Finally, according to defendants, Covington refused to undergo urinalysis at this time, but Covington denies being offered urinalysis.

Regardless, after both Drs. Roehrich and Murphy arrived to assess Covington, Roehrich ordered labs for Covington then left, while Murphy stated that he would make sure Covington was "taken care of." The parties dispute whether Dr. Murphy actually evaluated Covington's hyperglycemic symptoms. According to Covington, as soon as Dr. Roehrich left, Dr. Murphy and Nurse Bernier instead told Covington to go back to his unit. In contrast, Murphy reports he evaluated Covington but did not think he was having a medical emergency. More specifically, although Covington was experiencing hyperglycemia, Dr. Murphy found he was not presenting symptoms of diabetic ketoacidosis, which would have included chest pain, shortness of breath, abdominal pain, nausea or vomiting, confusion, rapid breathing, rapid heart rate, or low blood pressure. At this point, the parties all agree that Dr. Murphy did not offer plaintiff any insulin *and* that Nurse Bernier and he told Covington to return to his unit and wait to be seen by his provider. At that time, Bernier also flagged Covington's chart for APNP Bowens to review.

The following day, December 14, Bowens reviewed Bernier's notes. Bowens did not think it was necessary to see Covington until the results from the labs ordered by Dr. Roehrich

were available. According to Covington, however, he returned to HSU at least twice a day between December 15 and 19, 2017, to report excessively high blood sugar levels and worsening health, but was denied insulin each time. Covington also represents that on December 14, he heard Nurse Bernier tell Bowens that his blood sugar was still high, although APNP Bowens denies hearing any reports about Covington from December 14 through 18. On December 18, Covington had the blood tests ordered by Dr. Roehrich. Those lab reports showed Covington's A1C level at 12.6%, meaning that his average blood glucose level for the last three months had been about 315. Even so, APNP Bowens did not think these numbers presented an emergency because complications from hyperglycemia are typically slow and cumulative, not sudden.

On December 19, 2017, Covington was again scheduled for an appointment with Bowens, but first saw Dr. Roehrich, who encouraged him to keep his appointment, then went to see APNP Bowens, who (according to Covington) told him that his paranoia was so bad he should consider going back to Wisconsin Resource Center. Not wanting to be seen by Bowens, Covington then left HSU, although the following day, he returned to see Bowens because his symptoms had worsened. In particular, Covington reported that he was urinating frequently, had blurred vision and dry mouth, *and* felt "like stones are going through [his] blood" in his lower arms and legs. Covington also claimed his blood sugar was over 500. At that point, Bowens gave Covington insulin, then instructed him to administer his insulin on a sliding scale basis depending on his blood sugar checks.

According to Covington, he had previously been on a sliding scale insulin regimen, but had not needed to use it until December, at which time it was unavailable. Covington also avers that he returned to HSU for more insulin on the evening of December 20, but was denied.

Again, in contrast, defendants deny that Covington was prescribed sliding scale insulin before December. On December 20, however, APNP Bowens did order additional labs.

On the morning of December 21, Covington went to see Dr. Roehrich in HSU, who checked his blood sugar level, which registered as "unreadable" because it was so high. Dr. Roehrich then gave Covington insulin and contacted Bowens about sending Covington to the hospital emergency room. Checking the results of the labs from the day before, Bowens noted that when compared to Covington's December 18 lab results, he was also experiencing electrolyte imbalances. Those lab results also showed his blood sugar levels were over 800. Afterward, Bowens ordered that Covington should go to the hospital.

When he arrived at the hospital, Covington's blood glucose level was down to 683, but still too high. He was then provided with an additional 20 units of regular insulin and transferred to observation status to monitor his glucose levels. After a reassessment and being provided with insulin and IV fluids, Covington's vitals were later stable and he reported feeling better. The emergency department doctor diagnosed Covington with hyperglycemia and recommended that his previous diabetes regimen of metformin and insulin be restarted upon his return to Oshkosh. However, Covington was never diagnosed with diabetic ketoacidosis.

## OPINION

Plaintiff argues that defendants violated his Eighth Amendment rights by failing to provide him with adequate insulin to treat his hyperglycemia between December 13 and 21,

2017.[7] The state defendants have moved for summary judgment on plaintiff's claims, while plaintiff seeks the same as to liability. Summary judgment will be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, however, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to [reach] a verdict in [his] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (citation and internal quotation marks omitted). The standard does not change when determining cross-motions for summary judgment. *Calumet River Fleeting, Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 647-48 (7th Cir. 2017). The court must "construe all facts and inferences" in favor of each non-moving party in turn. *Id*.

## I. Eighth Amendment Claims

The Eighth Amendment prohibits "cruel and unusual punishment," and specifically, prohibits prison officials from acting with "deliberate indifference" to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). To succeed on a claim of constitutionally inadequate medical care, an inmate must

[7] Plaintiff alleges in his complaint that he had experienced diabetic-related ketoacidosis as a result of being denied insulin, but the record establishes that his hyperglycemia did not progress to ketoacidosis during the relevant time period.

show that: (1) he has an objectively serious medical need; and (2) defendants acted with deliberate (that is with subjective) indifference to that need. *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021); *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). Additionally, "[a] condition does not have to be a medical emergency to amount to a serious medical need under the Constitution." *Lewis v. Mitchell*, No. 11-3151, 2013 WL 772836, at *2 (C.D. Ill. Feb. 28, 2013) (cleaned up); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (finding that tooth decay can constitute an "objectively serious medical condition because of pain and the risk of infection.")

A prison official acts with the requisite deliberate indifference if the official "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same). Deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Medical providers may act with deliberate indifference if they prescribe a course of treatment without exercising medical judgment or prescribe treatment that they know will be ineffective. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016).

In addition, "denying or delaying appropriate treatment to an incarcerated person suffering from avoidable pain can violate the Eighth Amendment." *Howell v. Wexford Health*

*Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (plaintiff stated plausible claim for deliberate indifference where jury could find that guards needlessly delayed treatment of plaintiff's broken nose for a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (plaintiff stated plausible claim for deliberate indifference where he was needlessly denied treatment for painful dislocated finger for two days)). However, it is not enough for plaintiff to show that: he personally disagrees with a defendant's conclusions about the appropriate treatment, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); other medical providers reached a different conclusion about what treatment to provide plaintiff, *Pyles*, 771 F.3d at 409; or even that defendants could have provided better treatment, *Lee v. Young*, 533 F.3d 505, 511-12 (7th Cir. 2008). Rather, plaintiff must offer sufficient evidence for a reasonable jury to find that defendants' medical judgment was "so significant a departure from accepted professional standards or practices that it calls into question whether [that provider] actually was exercising his [or her] professional judgment." *Pyles*, 771 F.3d at 409.

Here, defendants do not deny that plaintiff's diabetes and hyperglycemia qualified as a serious medical need but argue that the undisputed facts would not allow a reasonable jury to infer that either Dr. Murphy or APNP Bowens acted with deliberate indifference to that need.

**A. Dr. Murphy**

Defendants argue the record compels a finding that Dr. Murphy exercised his medical judgment in determining plaintiff did not need immediate treatment on December 13, 2017, because plaintiff's blood sugar numbers and symptoms did not present a "medical emergency" or evidence of diabetic ketoacidosis. (Murphy dec. (dkt. #62) ¶¶ 11, 12.) Indeed, Dr. Murphy

maintains that he exercised his professional judgment in deferring any treatment plan to APNP Bowens as plaintiff's primary care provider. He further argues that because plaintiff has no evidence or professional opinion contradicting Murphy's decision to defer, no reasonable jury could find that Murphy's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that" Dr. Murphy "actually did not base the decision" on medical judgment. *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008).

The problem with Dr. Murphy's argument is that defendants concede Dr. Murphy provided plaintiff with *no* medical treatment despite plaintiff reporting to HSU with blood sugar levels between 350 and 400 *and* obvious symptoms of hyperglycemia, including frequent urination, unquenchable thirst, blurred vision and "feeling weird." Instead, despite insulin apparently being readily available, Dr. Murphy passed plaintiff for scheduling with APNP Bowens, not knowing when that appointment would actually occur. Ultimately, plaintiff ended up waiting nearly a week for an appointment, during which time he continued to experience frequent urination, unquenchable thirst, and blurred vision that worsened over the week without treatment. In addition, although both defendants and reputable medical sources warn about long-term complications from extended hyperglycemia, Dr. Murphy does not dispute in his or anyone else's professional judgment, that such a delay may have caused plaintiff harm, including discomfort, suffering, the worsening of plaintiff's condition, or even unseen cell damage.

On this record, a reasonable juror would not need medical training to know that plaintiff was suffering for days due to these uncomfortable and potentially dangerous symptoms. Further, a reasonable jury might conclude that Dr. Murphy's decision to deny treatment, despite the relative ease of providing it, amounted to deliberate indifference. *See Petties*, 836

F.3d at 730 ("[W]hether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment."); *Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012) (holding that the plaintiff stated an Eighth Amendment deliberate indifference claim because "even though [the four-day] delay [in treatment for plaintiff's infected gunshot wound] did not exacerbate [the plaintiff's] injury, he experienced prolonged, unnecessary pain as a result of a readily treatable condition"). Because these are disputed issues of material fact on which a jury may find Dr. Murphy's lack of treatment of plaintiff's apparent medical need amounted to deliberate indifference, summary judgment must be denied to both sides.

**B. APNP Bowens**

For much the same reasons, genuine factual disputes also preclude resolution at summary judgment of plaintiff's claims against APNP Bowens. Defendants argue that Bowens acted reasonably and exercised her medical judgment when she decided to wait to evaluate plaintiff until she received the results of lab tests ordered by Dr. Roehrich because plaintiff had not reported any "symptoms that indicated an emergent condition." (Bowens dec. (dkt. #63) ¶¶ 43–44.) However, like Dr. Murphy, APNP Bowens does not address record evidence suggesting plaintiff's need presented an emergency, particularly when a readily available treatment in the form of insulin could have prevented his continued suffering and potentially avoided an emergency hospital trip. Plus, even after Bowens received the results of plaintiff's A1C tests showing that his blood sugar levels had been above 300 for the past three months, Bowens declined to order insulin or fluids immediately because that level was "non-emergent" in her view. (*Id.* ¶ 47.) Worse still, according to plaintiff's version of events, APNP Bowens waited to administer him insulin until plaintiff presented in HSU with a blood sugar *over 500*,

denied him insulin later that evening, and provided no further treatment until his blood sugar had spiked to over *800*. Certainly, if a jury believed plaintiff's version of events, they could conclude that Bowens acted with deliberate indifference to plaintiff's serious medical need by allowing him to suffer needlessly while his symptoms of hyperglycemia were spiking.

## II. Qualified Immunity

Alternatively, defendants argue that they are entitled to qualified immunity from liability because plaintiff cannot show that failure to provide an inmate insulin under these circumstances violated a "clearly established statutory or constitutional rights" under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once this defense is raised, *plaintiff* bears the burden of defeating it by showing that: (1) the defendants violated a constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Thus, a plaintiff has the burden to defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, not-withstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 723-24 (7th Cir. 2013).

Because there are genuine factual disputes, defendants are not entitled to qualified immunity at this stage of the case. In particular, the Seventh Circuit has already held that "clearly established law prohibits [] defendants from denying insulin to a diabetic" who needs it. *Waldrop v. Wexford Health Sources, Inc.*, 646 F. App'x 486, 492 (7th Cir. 2016) (citing *Egebergh*

*v. Nicholson,* 272 F.3d 925, 928 (7th Cir. 2001) (denial of qualified immunity appropriate where jury could infer that defendants were deliberately indifferent to type 1 diabetic plaintiff's need for insulin)). Similarly, if a jury credited plaintiff's version of events -- that he presented to HSU with very high blood sugar and distressing symptoms -- they could reasonably conclude that defendants denied plaintiff insulin treatment despite knowing that he needed it to relieve patent hyperglycemic symptoms and avoid potential internal damage caused by extended hyperglycemia. Although defendants claim that they did not think or know that plaintiff needed emergency treatment, this is not sufficient to defeat qualified immunity where, as discussed above, a lay jury *could* reasonably conclude that defendants knew insulin would relieve plaintiff's distressing and serous medical need, regardless whether those symptoms had escalated to life threatening. Therefore, defendants are not entitled to summary judgment based on qualified immunity.

## III. Recruitment of Counsel

The court previously denied plaintiff's motion for recruitment of counsel. (Dkt. #26.) However, after receiving more information about plaintiff's diabetes and mental health issues in the parties' summary judgment briefing, the court believes that he will likely need the assistance of counsel to present his case at trial. So on the court's own motion, it will attempt to recruit counsel to represent him and the case will be stayed pending recruitment of counsel.

If the court finds counsel willing to represent plaintiff, it will advise the parties of that fact. Soon after, a status conference will be held to set a new schedule. Plaintiff is advised that the search for counsel may take several months, and there is no guarantee that the court will

succeed in recruiting qualified counsel willing to represent him. Accordingly, if he wishes to proceed to trial without counsel, he should notify the court.

ORDER

IT IS ORDERED that:

1. Plaintiff Reo Covington's motions for preliminary injunction (dkt. #52, 55, 77), default of partial summary judgment (dkt. #53), request for judicial notice of adjudicative facts (dkt. #65), and extension of time (dkt. #78) are DENIED without prejudice as MOOT.

2. Plaintiff's motion for partial summary judgment (dkt. #46) is DENIED.

3. Plaintiff's motion for default judgment against defendant Melanie Bernier (dkt. #56) is DENIED WITHOUT PREJUDICE, but will be revisited after plaintiff's claims against the other defendants are resolved.

4. Defendants Patrick Murphy's and Nancy Bowens' motion for summary judgment (dkt. #58) is DENIED.

5. This case is STAYED pending recruitment of counsel for plaintiff.

Entered this 8th day of September, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge